IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

Plaintiff,

vs.

**JAREMY ALEXANDER SMITH**,

Defendant.

Cr. No. 24-0434 JB

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America respectfully submits this sentencing memorandum in connection with the above-captioned matter. The United States is in receipt of the Amended Presentence Investigation Report ("PSR"), Doc. 63, and has no objections to the description of the offense conduct or the guideline calculations. As calculated by the PSR, Smith has a final offense level of 43 and a criminal history category of III, yielding an advisory guideline range of life imprisonment. For the reasons set forth below, the Government requests that this Court accept the Rule 11(c)(1)(C) plea agreement in this case, and sentence Jaremy Smith to the statutorily-mandated and agreed-upon sentence of life imprisonment without the possibility of parole.

### INTRODUCTION

In a shocking act of violent depravity, Smith, while under the cover of darkness, murdered a New Mexico State Police Officer on a stretch of Interstate 40 just outside Tucumcari, New Mexico. Smith fired three shots into Officer John Doe's head and neck to avoid arrest on an equally brutal murder he committed in South Carolina two days beforehand. In the 48-hour span

1

that separated the two murders – March 13, 2024, to March 15, 2024 – Smith drove across the country in a white BMW he had carjacked from his South Carolina victim, and he carried with him a loaded Taurus 9mm pistol he had stolen from her roommate and subsequently used to murder Officer John Doe.

The cold-blooded murder of Officer John Doe punctuated Smith's lifelong commitment to lawlessness, violence, and mayhem. From murder to robbery, hostage taking to burglary, and carjacking to larceny, Smith has managed in his 34 years to inflict incalculable suffering to those unfortunate enough to cross his path. If ever a man were deserving of a life sentence, it is Jaremy Smith. The United States urges this Court, in no uncertain terms, to accept the plea agreement and to sentence him to the statutorily-mandated lifetime of imprisonment, the only sentence that is available, the only sentence that is fair, the only sentence that will protect the community, and the only sentence that comports with any civilized society's notion of justice.

## I.     FACTUAL BACKGROUND

On March 15, 2024, at about 4:48 a.m., Quay County dispatch received a phone call from a truck driver who described a man, whose car was apparently disabled on the westbound shoulder of U.S. Interstate 40, trying to flag down cars. New Mexico State Police Officer John Doe, a five-year veteran of the agency who had served honorably and with distinction, was dispatched to the scene to assist the motorist.

Officer Doe arrived on scene at 5:04 a.m. At that time, two separate video feeds were active and captured the events that followed. One of those feeds was the patrol vehicle's dashcam video, which did not contain audio but was able to capture high-quality video despite it being still

dark.   The second feed was from Officer Doe's body-worn lapel video, which had lower-quality video but crisp audio.   Viewed and heard together, those two feeds provide a clear picture of what occurred next.[1]

As depicted in Image 1 below, Officer Doe pulled behind the white BMW with South Carolina tags that had a flat rear, driver's side tire.   By then, Officer Doe had activated the lights on his patrol vehicle.   As shown on Images 2 and 3, Smith immediately exited the driver's seat of the BMW and approached the passenger side of Officer Doe's patrol vehicle.   Smith was wearing a tan hoodie-style jacket with a different color hood and tattered jeans.



*Image 1: Screenshot of Exhibit 1 (00:00:18) showing Officer Doe's view when he pulled behind a white BMW at mile marker 318 on westbound Interstate 40*

[1] The United States has lodged with the Court Exhibits 1 and 2, which are respectively videos drawn from the dashcam and lapel feeds.   Doc. 65.



*Image 2: Screenshot of Exhibit 1 (00:00:28) depicting Smith exiting the driver's side of the white BMW seconds after Officer Doe arrived on scene.*



*Image 3: Screenshot from Exhibit 1 (00:00:33) depicting Smith approaching passenger side of Officer Doe's patrol vehicle*

After Smith arrived at the passenger window, he and Officer Doe had the following 20-second exchange:

> **Officer Doe**: Hey Bud.
>
> **Smith**: I have a flat tire.   Can you help me?
>
> **Officer Doe**: Ah, what are you needing?
>
> **Smith**: A tire.   I need a ride to the store.   Can you get me there?
>
> **Officer Doe**: Okay.   I can get you back to town real quick.   But, nobody's open tonight.
>
> **Smith**: [partially inaudible].   I can come back and get the car.

**Officer Doe**:  Okay.   Go to the front of my car real quick.   I will meet you up there real quick.   I'll get you . . .

Exh. 2 at 00:00:13 to 00:00:36.

A single gunshot rang out before Officer Doe could complete what would have been his last words.   That bullet hit Officer Doe in the forehead, entering about 3 inches from the top of his head and coming to rest in the left lobe of his brain.

After shooting Officer Doe in the head, Smith, as depicted in Image 4 below, calmly walked from the passenger window, around the front of the patrol car, to the driver's side window.



*Image 4: Screenshot of Exhibit 1 (00:01:02) depicting Smith, after shooting Officer Doe in the head, walking to driver's side window of the patrol vehicle*

When Smith arrived at the driver's side, he opened the door and paused for a moment to allow a tractor trailer drove past the scene.



*Image 5: Screenshot from Exhibit 2 (00:00:51)*
*depicting tractor trailer driving past scene*

Immediately after the tractor trailer drove past, the lapel video captures the sounds of two more gunshots ringing out in rapid succession. One of those shots hit Officer Doe on the left side of his neck, causing injuries to both his airway and jugular vein. The other shot hit Officer Doe in the left cheek, fracturing bones in his face before exiting through his right eye.

### Smith Kidnaps Officer Doe and Carjacks His Patrol Unit

After mortally wounding Officer Doe, Smith entered the driver's seat of the patrol vehicle and drove westbound on Interstate 40 with the lights still flashing. It is apparent from the dashcam and lapel footage that Smith did not fully move Officer Doe to the passenger seat, so the reasonable inference is that Smith was either fully or partially sitting on Officer Doe when he drove on Interstate 40. For the next five minutes, the sounds of Officer Doe gasping for air can be heard on the lapel recording, demonstrating that Officer Doe was still alive during the kidnapping. (Exh. 2 at 00:01:00 to 00:06:50).

A duress signal, which was connected to Officer Doe's in-car radio or his portable radio, was activated at approximately 5:09 a.m. It is uncertain how the duress signal was activated, but the most likely explanation is that Smith, who the lapel video shows fiddling with the buttons on the patrol unit's dashboard during the carjacking, inadvertently activated it himself. In response, backup units were dispatched to the location and found the unoccupied BMW with a flat tire.

In the meantime, Smith continued with the carjacking and kidnapping, driving the patrol vehicle westbound on I-40 for four minutes and 24 seconds before exiting on a frontage road. (Exh. 1 at 00:01:51 to 00:06:15). He continued driving for less than one minute on the frontage road before stopping, removing Officer Doe from the vehicle, depositing him on the dirt, and driving off. Neither video captures the extraction, however it is apparent from context that Smith removed Officer Doe from the driver's side door, further lending support to the idea that he had been sitting on Officer Doe up until then. Smith then got back into the patrol vehicle, and the dashcam captured the following image as he backed the patrol car away from the scene:



*Image 6: Screenshot from Exhibit 1 (00:07:43) depicting Officer Doe after Smith removed him from the patrol vehicle*

Officer Doe remained at this location for over an hour, where his lapel recording captured his continued struggles to breathe. (Exh. 2 at 00:07:00 to 01:08:55). Eventually, law enforcement located Officer Doe, and the lapel video was still running as they desperately attempted to administer aid. (Exh. 2 at 01:08:43 to 01:11:46). The first officer on scene, NMSP Agent Xavier Garcia, indicated that Officer Doe was still alive when found, having a pulse and taking deep breaths every 15 to 20 seconds. Officer Doe was pronounced dead at a local medical facility at approximately 7 a.m., with the cause of death being gunshot wounds to the head and neck.

### The Continuation of Smith's Flight

After removing Officer Doe from the car, Smith turned the unit around and drove in the opposite direction from which he came. He drove for another six minutes and stopped again. (Exh. 1 at 00:07:43 to 00:13:17). This time, he exited the vehicle and walked around its frontside, at which time the dashcam captured the following shot, which depicts Smith holding the murder weapon, a Taurus 9mm pistol.



*Image 7: Screenshot from Exhibit 1 (00:13:48) depicting Smith outside patrol vehicle with the murder weapon in his right hand*

As depicted in Image 8 below, Smith, while outside the patrol unit, used the Taurus 9mm to shoot out the patrol unit's flashing lights. He then re-entered the vehicle and drove off. Later, law enforcement recovered bullets from the frame of the vehicle.



*Image 8: Screenshot from Exhibit 1 (00:13:49) depicting Smith*
*shooting out the patrol unit's flashing lights*

After shooting out the flashing lights, Smith re-entered the vehicle and drove for another 10 minutes before crashing into some shrubbery on the north frontage road off Interstate 40 near mile marker 304, a location in Guadalupe County, New Mexico. (Exh. 1 at 00:14:51 to 00:24:50). Having no other choice, Smith abandoned the patrol unit at that spot – law enforcement would find it there later that morning – before fleeing westbound on foot. He made it 13 miles to Cuervo, New Mexico, where he stole a flatbed pickup truck and drove it to Albuquerque.

### *Smith's Connection to Albuquerque*

Smith was heading to Albuquerque because he had a former girlfriend, 21-year-old C.A., who lived with her parents on Albuquerque's west side. C.A. met the Smith through a dating application in 2020, when Smith was in prison in South Carolina. She remained in contact with Smith for four years, finally meeting him in person for the first time in December 2023, soon after Smith's release from custody (he was released on December 1, 2023, after serving 12 years on attempted robbery and hostage taking convictions). Between December 2023 and March 2024, Smith repeatedly returned to Albuquerque, staying with C.A. for short periods before heading back to South Carolina to check in with his probation officer.

C.A. reported that Smith "had a bad temper" and would make threats to kill her if she ended the relationship. Despite the death threat, C.A. ended the relationship on February 19, 2024, the day she and her mother dropped Smith off at the Albuquerque Sunport for what would be his last return trip to South Carolina. Notwithstanding the breakup, Smith continued to attempt contact with C.A., with the last call taking place at 3 a.m. on March 15, 2024, about two hours before Smith murdered Officer Doe.

### *Smith's Capture*

Smith's flight came to an end on March 17, 2024, when he entered a gas station on Albuquerque's west side, not far from where C.A. lived with her parents. Smith attempted a purchase that required an identification card, and he handed over his ID upon request. The store clerk recognized the distinctive spelling of Smith's first name, which, by then, had been widely circulated in the media along with his photograph. Understanding who stood before her, the clerk

immediately contacted law enforcement.

Bernalillo County Sheriff's Deputies arrived quickly, and almost walked into another ambush as Smith hid and waited for officers to enter the residential backyard in which he was hiding. But an alert citizen saw Smith's hiding position from a nearby window and warned officers of the danger. When Smith realized he would not be able to ambush and kill more officers, he ran through the residential neighborhood, the deputies hot on his heels. During the chase, Smith, still armed with the 9mm Taurus he used to kill Officer Doe, tossed the pistol over a wall. Law enforcement later recovered the weapon. Additionally, deputies located, near the gas station, the flatbed pickup truck that Smith had stolen in Cuervo, New Mexico. Inside the truck was 9mm ammunition.

### The Motive to Murder Officer John Doe

Less than 48 hours before murdering Officer Doe, Smith shot and killed a woman in South Carolina. The victim of that murder, Jane Doe, was 52-year-old paramedic who Smith met after his release from prison in December 2023. The two became acquainted through Jane Doe's roommate, E.B., with whom Smith was having a sexual relationship.

Jane Doe was last seen in the evening of March 12, 2024, when she and E.B. spent the evening together at their home. After they each went to bed, Smith knocked on E.B.'s bedroom window; she allowed him in and the two spent the night together. At about 6:20 a.m. the next morning, E.B. and Smith left the residence together. E.B. recalls that, when she left with Smith, Jane Doe's bedroom door was still closed and her white BMW was still parked in the driveway, indicating that she was still asleep at that time. E.B. went to work and Smith walked in the

direction toward his nearby residence.

Jane Doe's body was found two days later – the same day Smith murdered Officer Doe – in a secluded area in Nichols, South Carolina that is depicted in Image 9 below. She had been shot once in the back of the head execution style, still wearing her pajamas and house slippers. She had cut zip ties next to her arms, and her wrists showed tell-tale signs that she had been bound. She had two blood-soaked bandanas tied around her eyes and plastic packaging tape around her mouth and jaw.



*Image 9: Police photograph of field in Nichols, SC where Jane Doe's body was found.*

Phone and GPS records provide the best timeline of the events surrounding Jane Doe's murder. Through phone records, law enforcement knows that Jane Doe had a 53-minute phone conversation – it would be her last – that began at 9:14 a.m. on March 13 (this was approximately three hours after Smith and E.B. left the house). At 10:04 a.m., while Jane Doe was on the phone,

her white BMW executed a GPS "auto locate," which pinpointed it at her residence. Taken together, these GPS and phone records establish that Jane Doe was safely at home up until 10:04 a.m.

Things soon changed. The BMW's next GPS "auto locate" occurred at 11:57 a.m., which pinpointed the car on the opposite side of a wooded area located in front of Jane Doe's home. By 1:54 p.m., the BMW was approximately 20 miles away in Nichols, South Carolina, near the secluded area where Jane Doe's body would eventually be found two days later. The car remained at this location for three minutes and 14 seconds, ample time to remove the bound Jane Doe from the car, march her to a secluded spot, and shoot her in the head.

Agents were able to determine that Smith's two cellular phones, Jane Doe's cellular phone, and her BMW were all in the area where her body was found. Additionally, Smith and the BMW were captured on convenience store video immediately after leaving the location of the body and law enforcement identified an eyewitness who saw a person fitting Smith's description arrive in the BMW in the area and walk toward the convenience store.

The evidence establishes that Jane Doe was alive when Smith forcibly transported her to the location where her body was found. For instance, there was a large pool of blood under her head, indicating that she was shot at the location where her body was found. Further, her slippers were still on her feet and there were no visible drag marks on the ground or on her body that would suggest she was dragged to the location. Finally, neither shell casings nor blood were found in the BMW, which indicates that Jane Doe was shot after being transported in the car and removed from it.

All of this establishes that Smith kidnapped Jane Doe from her home, carjacked her vehicle, and used it to transport her to Nichols, South Carolina – away from unwanted attention – where he shot her in the head and left her to die alone in the secluded field.

After murdering Jane Doe, Smith stopped at a convenience store, bought snacks, then drove back to Marion, South Carolina where he connected with J.J., who himself had been released from a jail in South Carolina earlier that day. Smith told J.J. that the BMW which he was driving belonged to him and asked if he wanted to ride with him to Columbia or Atlanta. J.J. agreed.

Before leaving for Columbia/Atlanta, Smith and J.J. went to Jane Doe's residence – Smith described it as his "girl's house" – where they entered through a sliding glass door. Once inside, Smith opened a safe and stole six firearms. The two then drove to another residence in Marion, South Carolina where Smith sold the firearms for $1,500. Separate and apart from these six guns, after Jane Doe's disappearance E.B. discovered that she was missing a 9mm Taurus from her vehicle, the gun used to murder Officer Doe and likely used to kill Jane Doe.

After selling the firearms, Smith and J.J. drove 30 miles to a residence in Effingham, South Carolina, the home of a woman Smith claimed to have met online. There, Smith paid the woman for sex with him and J.J. Afterward, Smith put a black pistol – it was almost certainly the 9mm Taurus – to the woman's head and took back the money he had paid her along with her purse.

Smith and J.J. then left the scene. J.J., who thought he was going to Columbia and Atlanta, became alarmed when Smith passed those exits. Smith declined to tell J.J. where they were going, and, according to J.J., Smith became "disrespectful and aggressive," at one point threatening to kill him. J.J. took this threat seriously because, among other things, Smith kept the 9mm Taurus

on his lap or driver's side floorboard during the journey.   Finally, at a gas station in Texas, J.J. asked the attendant to call the police because he was in fear of Smith.   Smith left him behind, continuing toward New Mexico.

GPS data extracted from the BMW maps Smith's drive to New Mexico.   The western terminal point is mile marker 318 on Interstate 40, the location near Tucumcari, New Mexico where Smith fatally shot Officer John Doe.



*Image 10: GPS map of Smith's journey to New Mexico
from March 13, 2024, to March 15, 2024.*

.

## II.    THE CHARGES AND PLEA AGREEMENT

On April 9, 2024, the federal grand jury in the District of New Mexico returned an indictment charging Smith with six counts, including, carjacking resulting in death, in violation of 18 U.S.C. § 2119(3); discharging a firearm during and in relation to a crime of violence that resulted in death, in violation of 18 U.S.C. §§ 924(c)(1)(A)(iii) and (j)(1); kidnapping resulting in

death, in violation of 18 U.S.C. § 1201(a)(1); prohibited person in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1), (g)(2); and possession of a stolen firearm, in violation of 18 U.S.C. § 922(j).   On August 14, 2024, the United States alerted the Court and Smith to its intent not to seek the death penalty in this case.   Doc. 44.

On January 17, 2025, Smith pled guilty in reliance on that no-seek notice and was convicted of those offenses based on a guilty plea entered pursuant to a Rule 11(c)(1)(C) plea agreement. Under the terms of that agreement, the parties agreed that that a specific sentence of life imprisonment, as is statutorily required by 18 U.S.C. § 1201(a), is the appropriate disposition in this case.   Plea Agreement, ¶ 9a.

**STATUTORY PENALTIES**

Smith now faces sentencing on the five counts of conviction. As noted by the plea agreement and the Presentence Report issued by the U.S. Probation Office, Smith faces a mandatory life sentence for his conviction on Count 3, kidnapping resulting in death, in violation of 18 U.S.C. § 1201(a).   In addition, Smith faces up to life for violating 18 U.S.C. § 2119(3) (carjacking resulting in death); a mandatory minimum of ten years and up to life for violating 18 U.S.C. §§ 924(c)(1)(A)(ii), (iii), and 924(j)(1) (discharging a firearm during and in relation to a crime of violence that resulted in death); up to 15 years for violating 18 U.S.C. §§ 922(g)(1) and 924 (prohibited person in possession of a firearm); and up to 10 years for violating 18 U.S.C. § 922(j) (possession of a stolen firearm).

## III. THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). To be sure, "[t]he Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, in fashioning a proper sentence, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

The United States concurs with the guideline calculation set forth in paragraphs 52-65 of the PSR. Starting with Counts 1, 3, 4, and 5, the PSR determined that those counts group for guideline calculation purposes because Counts 4 and 5 embody conduct that is treated as s specific offense characteristic in, or other adjustment to, the guideline application of Counts 1 and 3, pursuant to USSG § 3D1.2(e). PSR at ¶ 54. With respect to those grouped counts, the guideline calculation is as follows:

**Counts 1, 3, 4, and 5**

| | | |
|---|---|---|
| Base Offense Level | 43 | § 2A4.1 and § 2A4.1(c)(1) |
| Adjustment | +6 | § 3A1.2(b): Victim Related Adjustment |
| Adjustment | +2 | § 3C1.1: Obstruction of Justice |
| Adjustment | +2 | § 3C1.1: Obstruction of Justice |
| Adjusted Offense Level | 53 | |
| Acceptance of Responsibility | -3 | §§ 3E1.1(a) and (b) |
| Total Offense Level | 43 | Chapter 5, Part A (comment n.2) |

Count 2 is excluded from the application of the grouping rules set forth in §§ 3D1.1(b)(1). PSR at ¶ 53. Pursuant § 2K2.4(b), the guideline sentence for that Count is the minimum term of imprisonment required by statute—here, 120 months. *Id*.

The United States concurs that Smith falls at Criminal History Category III, PSR at ¶ 125, which, combined with the calculations set forth above, results in a guideline term of life plus an additional 10 years. *Id*.

## IV.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(a)

While a life sentence in this case is mandated by statute, agreed upon by the parties, and advised by the sentencing guidelines, the factors set forth in 18 U.S.C. § 3553(a) further highlight the compelling need for it to be applied in this case. As described below, those factors overwhelmingly weigh in favor of a sentence of lifetime incarceration.

### A.    Nature and Circumstances of the Offense

As shown in Section I of this memorandum, Smith's crimes of conviction rank among the most atrocious a sentencing court can encounter—indeed, they shock the conscience. Under the

cover of darkness, Smith committed a cold-blooded, premeditated, and calculated murder of a law enforcement officer, a dedicated public servant who had gone above and beyond the call of his duty by offering to give Smith a ride into town.  Standing at Officer Doe's passenger window, Smith shot him in the head, walked calmly and cooly around to the driver's side, then shot him twice more.  With vehicles on Interstate 40 speeding past, Smith entered the police cruiser and *sat on* the dying officer.  While hearing Officer Doe gasping for breath, seeing him bleed, and smelling the gunshot residue lingering in the air, Smith put the police cruiser into gear and sped westbound on Interstate 40.  With the lights of the cruiser still flashing, Smith exited the freeway, found a remote location, dragged Officer Doe out of the car, and dumped his body on the ground. With Officer Doe's young daughters and pregnant fiancé sleeping at home, Smith got back into the car, backed it up a few feet, and looked out the windshield as the headlights illuminated the dying man lying faceup on the dirt.  Smith then continued his journey to Albuquerque.

If all that were not jolting enough, Smith did it to avoid capture on an equally horrific murder he committed less than 48 beforehand.  In South Carolina, he kidnapped, carjacked, and murdered another public servant, a paramedic.  He bound her, marched her to a secluded field, and cravenly shot her in the back of the head.  His first stop after doing that was at a convenience store where he bought snacks.

After executing Jane Doe, Smith drove back to her house, stole firearms from her safe, and sold them later that day for $1,500.  After selling the guns, Smith picked up J.J. and visited a sex worker, where he used some of that money to pay for his own gratification.  He then put a pistol to the sex worker's head, threatened to kill her, and demanded his money back.  She complied.

With J.J. alongside for the ride, Smith then started his cross-country trek to New Mexico. By the time they reached Texas, J.J. had to flee for his own safety because Smith threatened to kill him. Now by himself, Smith continued on toward Albuquerque, where he hoped to find a safe house with a woman he also once threatened to kill.

It was this unimaginable sequence of events that led Smith to a federal courtroom in Albuquerque. Now that he is here, only one sentence is justified. The nature and circumstances of Smith's crimes demand a sentence of life imprisonment.

### B. Smith's History and Characteristics

Smith's life of crime began in 2007 when he was 16. He was arrested and charged with five counts, including two burglaries, breaking into a motor vehicle, and larceny. A year later, he picked up another grand larceny charge for which he was convicted. As part of his sentence, he was ordered to a "shock incarceration" program. It did not work. That same year, when he was still 17, he was arrested on four separate occasions for (1) burglary; (2) receiving stolen goods; (3) grand larceny; and (4) indecent exposure. He was convicted on all but the grand larceny charge, and received either a probated or time served sentence on the remaining three.

Smith's adult crimes began when he was 20 when he was arrested for theft and distribution of marijuana. That case was dismissed. Two years later he picked up his first adult conviction after an arrest for giving false information. He received a time served sentence. That same year he was arrested for burglary and discharging a firearm into a vehicle. That case was dismissed.

All of that pales in comparison to the string of crimes that followed. When he was still 22, Smith was the getaway driver in an armed robbery that involved Smith and a co-conspirator

driving in a neighborhood in South Carolina where they encountered a 26-year-old man standing in his yard. Smith's co-conspirator exited the car, pointed a gun at the man, stripped him of his clothing, and stole his cell phone. Smith and his co-conspirator then sped off. When law enforcement later questioned Smith about the robbery, he laughed when describing how the victim was forced to remove his pants. Smith was sentenced to five years for that offense.

Smith managed to pick up three additional cases while serving his sentence on the robbery case. The first was in 2014 when, during an escape attempt, he took a correctional officer as a hostage. He was convicted of that offense and received a seven-year sentence that he served consecutive to the five years he was already serving for the robbery conviction.

While still serving his sentence, he was charged in 2014 with carrying a concealed weapon by a prisoner and participating in a riot. That case was dismissed. Two years later, while still in custody, he was charged with possessing contraband by a prisoner. That case was also dismissed.

That troubling history confirms that Smith's crimes of conviction were not an isolated event in an otherwise law-abiding life. To the contrary, Smith has been committing serious crimes since he was teenager, and his violent tendencies steadily escalated as he matured into adulthood. Indeed, Smith's crimes continued after arrest in this case when he attempted to escape from the Cibola County Detention Center on August 25, 2024. PSR at ¶¶ 36-40.

Smith's history and characteristics, including his history of arrests and convictions for violent crimes and history of violent rhetoric, attest that the statutorily-mandated and agreed-upon life sentence is just, proper, and imperative.

**C.    The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law**

As with the nature and circumstances of the offense, this factor overwhelmingly supports a sentence of life.   The United States trusts that no further exposition is necessary to establish that Smith's crimes represent the epitome of disrespect for the law.

**D.    The Need for the Sentence to Afford Adequate Deterrence**

*General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. § 3553(a)(2)(B).   The need to deter others is especially strong in cases involving violent crime directed at law enforcement officers.   The demands of general deterrence weigh strongly in favor of the statutorily-mandated life sentence, as they will for nearly every case involving the kidnapping and murder of a law enforcement officer.

*Specific Deterrence*

The need for the sentence to provide specific deterrence to Smith also weighs heavily in favor of the mandated life sentence.

If one lesson can be drawn from Smith's life, it is this: he will not stop hurting innocent people.   Depending on his needs at any particular moment, Smith will threaten, steal, rob, assault, take hostages, carjack, kidnap, and kill.   That pattern is firmly established, and nothing in Smith's history or characteristics hints that he can be reformed.   To be sure, Smith has displayed no remorse for the wake of misery he has left behind him.   When questioned by police about the 2013 robbery, Smith laughed.   When brought before this Court to plead guilty, he smiled when entering the courtroom.   When given a chance by United States Probation to make a statement for

inclusion in the PSR, he demurred to the antiseptic facts set forth in the plea agreement. PSR at ¶ 43. In short, Smith is a remorseless killer beyond any meaningful prospect of rehabilitation.

For a defendant like Smith – an unrepentant murderer – specific deterrence can only take one form—lifetime imprisonment. The Court can be confident that any sentence that would afford Smith an opportunity to walk as a free man would be inadequate to give voice to this § 3553 factor.

## V.     CONCLUSION

For the reasons set forth above, the Government requests that the Court sentence Smith to the statutorily-mandated and agreed-upon sentence of imprisonment for life without the possibility of parole.

Respectfully submitted,

HOLLAND S. KASTRIN
Acting United States Attorney

_____/s/_____
Jack Burkhead
Assistant United States Attorney
Albuquerque, New Mexico 87102
(505) 346-7274

_____/s/_____
Paul Mysliwiec
Assistant United States Attorney
Albuquerque, New Mexico 87102
(505) 346-7274

## CERTIFICATE OF SERVICE

I hereby certify that I filed the foregoing document electronically through the CM/ECF system. Pursuant to the CM/ECF Administrative Procedures Manual, §§ 1(a), 7(b)(2), such filing is the equivalent of service on parties of record.

***<u>Electronically filed March 5, 2025</u>***
Jack Burkhead
Assistant United States Attorney